## Application of GENERAL TELEPHONE COMPANY OF FLORIDA
Docket No. 9368-TP, Order No. 4461-A.
Florida Public Service Commission.
January 8, 1970.

Hugh C. Macfarlane and James W. Ault, both of Tampa, and John Robert Jones, Columbus, Ohio, for the applicant.

Lewis W. Petteway, General Counsel, and W. L. Weeks, Tallahassee, for the commission staff and the public generally.

Daniel Martin, New Port Richey, for Pinellas County.

Chairman WILLIAM T. MAYO and Commissioners JERRY W. CARTER and JESS YARBOROUGH participated in the disposition of this matter.

BY THE COMMISSION.

*Order requiring reductions and refund:* Pursuant to due and proper notice the commission held eleven days of public hearings in this docket during the months of July through September, 1969, in the cities of Tampa, St. Petersburg, Clearwater, Sarasota, Bartow and Tallahassee on the commission's own motion for the purpose of considering the adequacy and efficiency of telephone service being rendered by General Telephone Company of Florida, and the making of adjustments in the company's temporary rates based on the quality of such service, if any such adjustments appeared to be warranted.

On November 26, 1968 the commission issued its order no. 4461 in this docket granting General Telephone Company of Florida a temporary increase in rates under bond. In this order, the commission was critical of the service being rendered by the company, and for that reason, the increases were made on a temporary basis; and the bond was required to insure whatever refund the commission might require on further consideration of the service rendered by the company.

### Consideration of service in fixing utility rates

Some reference should be made at the outset concerning the authority of the commission to consider the quality of service when fixing rates to be charged by a public utility in Florida.

The legislature of this state has fully authorized the commission to give meaningful consideration to the adequacy and quality of service when fixing public utility rates. The validity of this 1967 law has been upheld by the Supreme Court of Florida, and this commission has stated in previous orders that it will not hesitate to make use of this law to such extent as may be justified by the facts in each particular case. We fully recognize the importance of adequate and efficient public utility services in the continually expanding economy of this state. We shall expect all public utilities under the jurisdiction of this commission to provide such high quality of service as we reasonably may require. We believe this is consistent with the legislative intent as expressed in Florida's Rates and Service Law.

Section 366.041, F. S., frequently referred to as Florida's Rates and Service Law, provides that in fixing just, reasonable, and compensatory rates, the commission is authorized to give consideration, among other things, to the efficiency, sufficiency, and adequacy of the facilities provided and the service rendered; the value of the service to the public; and the ability of the utility to improve such service and facilities. In its consideration of such matters, the commission is required to hear service complaints, if any, that may be presented by subscribers and the public during any proceeding involving such rates. Finally, it is specifically provided in the statute that the law shall be liberally construed to further the legislative intent that adequate service shall be rendered by public utilities in this state in consideration for the rates fixed by the commission.

The rates granted under bond in this docket were made on a temporary basis pursuant to the authority and the intent of said Rates and Service Law. Our further consideration of said temporary rates, and the issuance of this present order, are pursuant to the authority and powers vested in this commission by the terms of said law.

## Commission's standards of service

Under the laws of this state, this commission is authorized to adopt and enforce rules and regulations governing the furnishing of intrastate telephone service. Acting pursuant to that authority, the commission has adopted service standards which presently are in effect and have been since December 1968. These rules and regulations set up certain minimum standards for various categories of service and require periodic tests, measurements, and reports which, together with field investigations by commission personnel, are calculated to keep the commission advised concerning the quality and adequacy of service being rendered by telephone companies operating in this state under the jurisdiction of the commission. Such reports and investigations have been available to the commission in its consideration of the issues involved in this proceeding.

## Telephone company's position in this docket

General Telephone Company of Florida has taken the position in this docket that this proceeding is limited to certain issues which are confined to its compliance with commission standards relating to installation intervals, repair intervals, number of toll connecting trunks, EAS and interoffice trunks, and operator answering time. It is also the company's position that it is complying with the standards prescribed by the commission with respect to said areas of

service; that no other areas of service are involved; and that, even under said temporary rates, the company is not earning the return previously found by the commission to be reasonable.

The company contends that the commission, in its order no. 4461, complied with the statutory requirements by specifying the foregoing areas of service deficiency and then gave the utility until June 30, 1969 to demonstrate the correction of such deficiencies. Therefore, the argument goes, the commission cannot go beyond those specifications of deficiency, but must limit its further consideration in this docket to those specific areas.

The company also contends that the complaints of public witnesses heard by the commission during the hearings in this docket are not representative of its many subscribers; and are not sufficient to offset the company's compliance with the service standards prescribed by the commission. The thrust of this contention is that service standards must be the primary test in determining whether a public utility is providing service of an acceptable quality and sufficiency.

### The commission's position on service issue

The company's position, with respect to the limited nature of this phase of the present docket, was presented to the commission for its consideration and disposition during an open hearing, and the commission ruled that all areas of service were involved and would be inquired into during the progress of this proceeding.

The legislature has imposed upon this commission the duty of hearing public complaints, if any, when fixing the rates of a public utility. The law is silent concerning the weight that shall be given to such complaints; however, this is the only measurement included in the statute which must be considered by the commission in determining the efficiency, sufficiency, and adequacy of the facilities provided and the service rendered, and the value of such service to the public. Therefore, the conclusion is obvious that such complaints, if any, must be given reasonable weight by the commission in its consideration of the quality and adequacy of the service being rendered.

In a previous docket involving this company (order no. 4223, docket no. 6451-TP) this commission stated that it could not be satisfied with the service being rendered by this telephone company so long as members of the public continue to complain about service. In order no. 4461, entered in the present docket on November 26, 1968, we observed that "this commission still receives what it considers to be an unreasonable number of service complaints from

the area served by this telephone company." We renew the same observation as a result of many complaints received in our Tallahassee office and the Tampa district office which are referred to the company for appropriate corrective action.

General Telephone Company of Florida, during the past several years, has been confronted with considerable growth and the many problems involved in such growth. Unquestionably, there has been considerable improvement in the service rendered; and the company has spent and is spending millions of dollars in the improvement and expansion of its plant and facilities. However, ever since this operation was acquired by General, and even before that, the public in its service area has been plagued with less than the best in telephone service. The commission has found it necessary to investigate the service of General on more than one occasion, and has been severe in its criticism of continuing deficiencies in such service. In the past, the commission has not withheld rate relief because of poor service, primarily because it was not allowed to consider rates and quality of service in the same proceeding. Now, the legislature has placed upon the commission an affirmative duty to see that public utility rates are justified by the quality and sufficiency of the service being rendered in consideration of such rates.

The public image of this public utility is not what it should be in its service area, and the company should muster every effort to overcome that handicap. Recognition of its service problems, together with preventive and corrective maintenance, could change this image and eliminate much public opposition to reasonable earnings and rate increases that may be necessary to achieve such earnings..

While we recognize that the commission could never begin to hear the sworn testimony of a substantial percentage of the customers or subscribers of a large public utility, nevertheless, the commission was able to hear many witnesses in this docket; and could have heard many more had time permitted, or had all witnesses been able to stay throughout the hearings. In its opinion, the commission did hear sufficient public witnesses to indicate to it that the company still has not achieved as much improvement in the quality of its service as this commission feels it should. This is particularly true in the light of the number of trouble reports received by the company and covered by reports to the commission. The record shows that for the six-months' period ended June 30, 1969, the company received a total of 402,741 trouble reports. The record also shows that a "trouble report" is a report or complaint received by the company from a subscriber or customer with respect to a service problem or condition. Obviously, this is a sub-

stantial number of reported troubles and lends substance to the testimony of those complaining witnesses who took the time to attend a public hearing, gave their complaints under oath, and submitted themselves to cross examination.

Order no. 4461, which granted temporary rates under bond, specifically provided that the rates would be temporary to and including June 30, 1969, at which time, or as soon thereafter as conveniently possible, the commission would make a determination concerning service deficiencies, if any, and readjust the rates on the basis of service rendered during the period when such temporary rates were in effect. The clear intent of this language is that the commission would again look at the overall service rendered by General before making the temporary rates permanent or adjusting them downward for service deficiencies. Later, in order no. 4696 giving notice of further hearings in this docket, the commission specified that such hearings would be for the purpose of giving further consideration to the temporary rates previously granted to General Telephone in the light of the adequacy and sufficiency of the telephone service rendered by the company. As a part of said notice, the company was directed to present to the commission at said hearings all relevant data, testimony, and exhibits, necessary and appropriate to fully advise the commission concerning the adequacy and sufficiency of the telephone service rendered by it in its service area.

The company's position that the latest phase of this proceeding is limited to a consideration of certain areas of service is not well founded, and the commission's prior ruling with respect thereto should be reaffirmed.

We have already commented on the substantial number of trouble reports received by the company during the six months' period ended June 30, 1969. We consider total customer reports per 100 stations as a significant indicator of the quality of service being rendered by a telephone utility because they are received by the company in the day-to-day operations of its business and are made by users of such service at the time service deficiencies are experienced. Such reports are not made for any purpose other than to obtain some improvement in existing service. They represent real problems to the telephone user, otherwise, most people would not bother to report the trouble to the utility.

Some reference should be made to one phase of answering time which appears to be troublesome. Complaints have been registered with respect to an operator leaving the line before taking the necessary information for a long distance call. Operators are required

to answer within a specified time, but frequently will answer and then ask the calling party to wait a moment. Any measurement of answering time would credit the operator with meeting the requirement; however, so far as the calling party is concerned, the operator might just as well have waited to answer. The company explains that such procedure is necessary to complete the processing of a call already being handled by the particular operator. Nevertheless, when the operator answers, she should be ready to serve the calling party if the commission's requirement with respect to answering time is to be properly met.

While the company has made substantial improvement in handling applications for new service, it still has some problems as indicated by applications for new service in the base rate area of some exchanges which have been held for more than thirty days. We are strongly of the opinion that applications for new service within any exchange base rate area should, with minimal exceptions, be capable of satisfaction well within a thirty-day period. The commission regulations on availability of service provide no specific standard in this regard. However, the absence of a specific standard does not relieve the utility of its obligation to provide acceptable and satisfactory service. The standards adopted by the commission are intended as a means of assisting the commission in measuring the quality of service, but such standards are by no means exclusive.

The situation, with respect to held applications for upgraded service, has been subtantially improved since 1967 when compared with historical data for prior years. However, the company still has more held applications for regrades than we can justify for a public utility that has a legal obligation to provide the service which reasonably may be required by the public. Under the laws of this state telephone companies have been granted certificates of public convenience and necessity giving them the exclusive right to provide telephone service in those areas "which they profess to serve." For a telephone company to profess to serve a given territory simply means that the telephone company holds itself out to serve that area. When a telephone company, therefore, has several thousand held applications for better grades of service, it obviously is falling down on its obligation to provide such service as the public is entitled to receive. The record shows that at the end of the first three calendar quarters of 1969, General Telephone Company of Florida had 8,191, 7,893, and 8,500 applications for regrades which it had not been able to meet. In this day and age telephone service, good telephone service, has become a necessity and our affluent society will no longer tolerate service that fails to meet its reasonable requirements.

*The Company's right to a reasonable return*

General contends that it is entitled to earn a reasonable return; but that, even with the temporary rates in effect, it is not earning the return that the commission had previously found would be reasonable. Therefore, it is argued that the commission is without authority to reduce its rates at the present time. We cannot agree with this contention. The trouble with this argument is that it presumes that the return previously fixed by the commission as being reasonable applies regardless of the quality and adequacy of the service rendered by the utility. Obviously, this was not the intention of the commission when it fixed the rate of return the company would be allowed to earn. At the time the return was fixed the rates were constructed, by direction of the commission, so that the resulting rate of return would approximate the lowest level of the range found by the commission to be reasonable. At the same time, the commission directed the company to make satisfactory improvement in its service by June 30, 1969, or be prepared to make appropriate reductions with refunds covering the excess collected above the reduced rates. A bond in the amount of one million dollars was required to insure such refunds as might be directed on further consideration of the quality and adequacy of service rendered by the company. Obviously the commission, when approving the temporary rates, was fixing a return that the company would be allowed to earn in consideration of the furnishing of adequate, efficient, and sufficient service. If the company failed to make the necessary improvement in the quality and adequacy of its service, then its return would be appropriately reduced because under such circumstances, it would not be entitled to earn as high a return as it would if its service was satisfactory. This rationale is implicit in the laws of this state, and the order of the commission previously entered in this docket. Further, the company recognized this possibility when it posted the one million dollar bond; accepted the temporary rates; and undertook to make the necessary improvements in its service. We recognize that the company is entitled to a reasonable return, but we cannot agree that such a return must be measured by what it would be entitled to if it were providing adequate and satisfactory service.

The first application of Florida's Rates and Service Law, by this commission, involved United Telephone Company of Florida. The commission found in that case that 7.18% would be a fair and reasonable rate of return for United to earn. However, the commission also found that the telephone service rendered and the facilities provided by United were inefficient, insufficient, and inadequate, and that it would be unreasonable to allow any increase

in rates at that time. United sought review of the commission's order in the Supreme Court of Florida on the grounds that the Rates and Service Law was unconstitutional and that its application by the commission, likewise, was unconstitutional. The Supreme Court upheld the constitutionality of the law and affirmed the action of the commission in applying the law. Later, United filed a new petition with the commission together with a motion for emergency increases on the ground that its return was continuing downward and jeopardizing the ability of the company to continue its improvement program. After a public hearing and a finding that the company had made substantial improvement in its service, although not as much as the commission felt it should, emergency relief was granted so that the company might be able to continue to improve the quality of its telephone service and achieve, at the earliest reasonable time, the high standard of service to which the public is entitled.

Changes of major significance have taken place in the nation's economy and public utilities in Florida and elsewhere are confronted with the tremendous task of raising hundreds of millions of dollars in order to improve their service and to meet surging demands for new service. The obligation to serve makes it impossible for public utilities to curtail expansion and construction programs to the same extent that unregulated businesses might be able to do in an inflated economy.

In fixing public utility rates, this commission has a duty to consider the quality of service being rendered by the utility in question. At the same time, it has a responsibility to give a public utility an opportunty to meet its service obligations through necessary plant additions. This requires constantly increasing capital expenditures which cannot be financed if the return is unreasonably low. Thus, in cases of this kind, the commission is faced with the difficult problem of withholding such rate relief as may be justified because of service being rendered and granting sufficient relief to enable the utility to continue its service improvement program. The granting of too much relief would, of course, be unfair to the public. At the same time, the granting of insufficient relief would not only penalize a utility that is making every effort to improve its service, but would prolong the poor service through the company's inability to finance further improvement. Our power to withhold rate relief in appropriate instances, where the quality of service justified such action, is a powerful tool that is bringing about a steady and substantial improvement in public utility services, as is evident in this particular case which has now been before the commission for more than two years. The purpose of the law is to achieve good service and its reasonable use will accomplish that purpose. At the same

time, we must be careful that we do not jeopardize the ability of a public utility to accomplish the purpose of the law.

The problem in a case of this kind is very similar to the problem faced in determining a fair rate of return. There is no recognized formula whereby an exact determination can be made. The decision is primarily one of judgment. However, because of the direct relationship between the ability of a company to improve its service and the ability of that company to finance its improvement program, we feel that we must be guided to some extent by the earnings of the company in question. At June 30, 1969, General's earned rate of return was 6.80%. Subsequent reports were filed with the commission indicating that the company's return is trending downward, and in November was 6.42%. We do not feel that this has reached a confiscatory level; however, we do not believe that we safely can force the return much lower and still achieve continued improvement in service. It is for that reason that we have determined it is in the best public interest to permit General to retain a portion of the temporary increases previously granted under bond, and to require the company to reduce its rates by the amount that we have not allowed the company to retain. Of course, appropriate refunds must be made for the excess collected during the fourteen months that the temporary rates will have been in effect.

### Certain dues disallowed as operating expense

The record in this case shows that General Telephone Company of Florida maintains memberships in such organizations as Florida Committee of One Hundred, University Club, Palma Ceia Golf and Country Club, Tampa Yacht and Country Club, Gasparilla, and similar organizations. Such memberships are carried either in the name of the company or an individual who works for the company. In either event, the dues and membership costs are paid by the company and treated as an operating expense. We do not believe that such dues and membership costs, either for company or individual memberships, can be classified properly as an operating expense of the company. Therefore, such costs are hereby disallowed as an operating expense. If such memberships are maintained in the future, they must be at the expense of the stockholders and not the subscribers.

### Reductions and refund required

Increases in intrastate gross annual revenues in this docket were authorized by the commission, on a temporary basis, in the amount of $4,269,854. By the time this order can become effective, the company will have collected the temporary increases for a period of fourteen full months. However, all of the increases were not

related to service. Some of the increases were derived from such sources as installation charges, and other miscellaneous items. The non-service related increases account for $908,791 of the aforesaid total, leaving service related increases of $3,361,063.

We have previously established the precedent of allowing a public utility to retain non-service related increases when its rates are being reduced because of service deficiencies. We did that in the recent Southern Bell and the United Telephone cases, and we see no reason for not following that precedent in this case.

With respect to increases which are service related, that is, the $3,361,063, the majority of the commission is of the opinion that the company has made a major effort to bring about necessary improvements in its service; and that this effort has been at least partially successful. We believe that the company should be allowed to retain 50% of such increases in recognition of its effort to improve its service, and the improvements that have been made, which efforts must be continued until the company is able to render an acceptable and satisfactory service. This means, of course, that the company should now reduce its intrastate gross annual revenues by the amount of $1,680,531.

On the foregoing basis, since the temporary rates will have been in effect for a period of fourteen months, the company will have collected a total of $1,960,619 in excess of what we find it should have collected in view of the quality of service rendered during said period when the temporary rates were in effect. Therefore, the company should be directed to refund to its subscribers such excess collections in the total amount of $1,960,619. Our calculations indicate that this refund should be made on the basis of $1,013,562 for business service, $900,002 for residence service, and $47,055 to hotels and motels for message charges.

Reductions required by this order should be made effective with all bills rendered on and after February 15, 1970. The refunds contemplated by this order should be credited on the same bills.

## Findings

Based upon the entire record herein, the commission makes the following findings —

1. Telephone users in the service area of General Telephone Company of Florida are not receiving the kind of telephone service to which they are entitled and should not be required to pay rates which are fixed on the basis of adequate and efficient service.

2. General Telephone Company of Florida has failed to provide reasonably adequate and efficient telephone service within the

certificated area which it "professes to serve" and which it is obligated to serve under the laws of this state.

3. The telephone service furnished by General Telephone Company of Florida to the public in its service area is not at the present time of sufficient value to the public to justify the full temporary rates previously authorized under bond.

4. General Telephone Company of Florida should be required to reduce its intrastate gross annual revenues by the amount of $1,680,531, which represents 50% of the temporary increases previously authorized under bond.

5. General Telephone Company of Florida should be required to refund to its subscribers the sum of $1,960,619, which represents the excess revenues collected over a period of fourteen months from the time the temporary rates became effective and the date the reductions required by this order can be made effective.

6. When the reductions, aforesaid, have been made effective, the resulting rates will be fair and reasonable when consideration is given to the adequacy and quality of service rendered by General Telephone Company of Florida.

7. The reductions required by this order should be made effective with all bills rendered on and after February 15, 1970, and the refunds required herein should be credited on said bills.

8. The refunds in the amount of $1,960,619 should be on the basis of $1,013,562 for business service, $900,002 for residence service, and $47,055 to hotels and motels for message charges.

9. The company should be required to file appropriate tariff changes, for the commission's approval, making effective the reductions required by this order.

10. The rates and charges of General Telephone Company of Florida, when reduced as required by this order, will be sufficient to permit said telephone company to earn a fair and reasonable return when consideration is given to the failure of General to furnish reasonably adequate, efficient and sufficient telephone service to the public in its certificated area.

Now, therefore, in consideration thereof, it is ordered that the findings herein be and the same are hereby approved in every respect, and General Telephone Company of Florida is hereby directed and required to file with this commission for its approval appropriate tariff changes making the reductions contemplated by this order effective with all bills rendered on and after February 15, 1970.

It is further ordered that said telephone company make effective the refunds contemplated by this order through appropriate credits to bills rendered on and after February 15, 1970.

It is further ordered that General Telephone Company of Florida continue its efforts to improve its telephone service to the end that the public in its certificated service area will have service that meets the reasonable requirements of the public.

Dissenting opinion by Chairman MAYO —

My difference of opinion with the majority of the commission is not complete, but to a serious degree as it relates to the dollar distribution to be retained by General Telephone Company of Florida, and that to be refunded to its subscribers.

I am in accord with the majority that certain non-service related charges which were allowed to be increased on a temporary basis should become permanent. These increases would have no effect on the telephone subscriber so long as the subscriber does not desire some change in type of service or equipment. Neither are these charges related to the quality of telephone service.

I am also in accord with the majority that no longer should the company's subscribers, through telephone rates, pay the costs of company executives' or employees' membership dues or fees in country clubs, civic clubs, or similar organizations.

The above mentioned non-service related charges represent less than 25% of the overall increase sought by the company.

I completely disagree with the majority that the Company should retain *any* of the increases directly related to telephone service since this results in the subscriber paying increased rates for telephone service, the quality of which has not been improved to any noticeable degree during the time the temporary rates have been effective.

This conclusion relating to the quality of service presently being provided to the subscribers of General Telephone is made after reviewing all testimony in this record as well as all other information available to the commission.

The company has not shown that it has made sufficient effort to improve service to its existing customers who have not had adequate service in the past, and at the same time meet its needs to expand service for new customers. It is not enough for the company to only meet expansion requirements. It should also improve service for present and old customers.

Since it was not the intent of the commission when the temporary rate increase was granted that these increases would become permanent unless service was improved, I must conclude that in fairness to its customers who have paid these higher rates for many months, and who have not benefited by improved service that General Telephone should refund all increases which have been collected for telephone service. This would result in slightly more than 75% of the total increase sought by the company being refunded and less than 25% being retained by the company for non-service charges.

I do not believe that the company would be financially harmed to any serious degree if the above conclusions had been made by a majority of the commission. This company is not wholly dependent on its subscribers to always provide sufficient revenue through rates to meet all of its financial obligations. It is a subsidiary corporation with the ability to have made available to it sufficient funds to make adequate improvements in its service to its subscribers without its subscribers being required to pay in advance for improved service with only the hope that some day in the future they would get it.